Kenneth S. Kasdan, SBN 71427
kkasdan@kasdancdlaw.com
Graham B. LippSmith, SBN 221984
glippsmith@klwtlaw.com
Jaclyn L. Anderson, SBN 258609
janderson@klwtlaw.com
**KASDAN LIPPSMITH WEBER TURNER LLP**
360 East 2nd Street, Suite 300
Los Angeles, CA  90012
Tel: 213-254-4800; Fax: 213-254-4801

*Counsel for Plaintiff*
*[Additional counsel listed on signature page]*

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| MICHAEL I. GOLDBERG, as Trustee for the WOODBRIDGE LIQUIDATION TRUST, | Case No. 2:19-cv-3439 |
| Plaintiff, <br> v. | **COMPLAINT** |
| COMERICA BANK, <br><br> Defendant. | 1. **AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER CAL. CIV. CODE § 3439.04(a)(1);** <br> 2. **AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER CAL. CIV. CODE § 3439.04(a)(2);** <br> 3. **AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER CAL. CIV. CODE § 3439.05;** <br> 4. **UNJUST ENRICHMENT; and** <br> 5. **INCORPORATED CLAIMS** <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT AND DEMAND FOR JURY TRIAL

## **COMPLAINT TO AVOID AND RECOVER FRAUDULENT TRANSFERS**

Michael I. Goldberg, as Trustee for the Woodbridge Liquidation Trust ("Trustee"), sues Comerica Bank ("Comerica"), and states and alleges as follows on information and belief:

## I.      **INTRODUCTION**

1.      Through the Woodbridge Group of Companies, LLC and its affiliated entities (collectively the "Woodbridge Entities"),[1] Robert Shapiro ("Shapiro") used accounts at Comerica to orchestrate a massive Ponzi scheme.  Through those entities, Shapiro marketed promissory notes and other offerings to investors as low-risk, high-yield investments backed by high-interest real estate loans to third-party commercial borrowers. In reality, the Woodbridge Entities had few real counterparties and minimal sources of revenue other than from new investors.  Nearly all of the purported supporting loans were to Shapiro's own shell companies.  Shapiro paid the returns owed to investors using new investor money, raising more than $1.22 billion before the Ponzi scheme collapsed.

2.      Each of the Woodbridge Entities' bank accounts was opened and maintained at Comerica and was used to perpetrate Shapiro's fraudulent scheme.      Shapiro

---

[1] The Woodbridge Entities include the Woodbridge Group of Companies, LLC, Woodbridge Structured Funding, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, Woodbridge Commercial Bridge Loan Fund 2, LLC, Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage Investment Fund 3, LLC, Woodbridge Mortgage Investment Fund 3A, LLC, and Woodbridge Mortgage Investment Fund 4, LLC.

2

misappropriated millions of dollars for his personal use and used $368 million in new investor funds to pay existing investors out of these Comerica accounts.  He also pooled investment funds from holders of promissory notes and his other fraudulent offerings in fund entity accounts, further commingling those funds into a single Woodbridge operating account at Comerica.  The commingling involved transfers of around $1.66 billion and nearly 11,000 Comerica account transactions.

3.     Shapiro's banking activities at Comerica were integral to his scheme to defraud investors.  Comerica generated substantial fees from the fraudulent banking activity.  This lawsuit seeks to recover those fees pursuant to California's Uniform Voidable Transactions Act, Cal. Civ. Code §§ 3439-3439.14.

## II.    THE LIQUIDATING TRUST

4.     Shapiro's banking activities drew the attention of the Securities and Exchange Commission ("SEC") and several state regulatory agencies.  The SEC's enforcement actions led that agency to conclude that Shapiro was running a Ponzi scheme.

5.     In December 2017, most of the Woodbridge Entities and their affiliates declared Chapter 11 bankruptcy.  On October 26, 2018, the U.S. Bankruptcy Court for the District of Delaware entered an order confirming the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* (the "Plan").

6.     Under the terms of the Plan, the Woodbridge Liquidating Trust (the "Trust")

COMPLAINT AND DEMAND FOR JURY TRIAL

was formed to pursue, hold and administer the liquidation of trust assets and to make distributions to the Trust beneficiaries.  In confirming the Plan, the court approved the appointment of Michael Goldberg as the Liquidation Trustee for the Trust (the "Trustee").

7.   Pursuant to the Plan, the Trustee is authorized to pursue all avoidance actions and causes of action held by the bankruptcy Debtors[2] (including the Woodbridge Entities) and their estates (the "Estate Claims").  Also included in the Trust are claims held by investors who elected to contribute to the Trust all causes of action that are related to the bankruptcy Debtors (the "Contributed Claims").

8.   The claims asserted herein by the Trustee are asserted solely in the Trustee's capacity as assignee of the Estate Claims, and not in his capacity as assignee of the Contributed Claims.

## III.   PARTIES, JURISDICTION, AND VENUE

9.   Michael I. Goldberg is the Liquidation Trustee for the Woodbridge Liquidation Trust and is a citizen of the state of Florida.

10.   Defendant Comerica Bank is a Texas banking association with its principal place of business in Dallas, Texas.

11.   This Court has subject matter jurisdiction pursuant to under 28 U.S.C. § 1332 based on diversity of citizenship.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

---

[2] A full list of the Debtors is attached as Exhibit 1 to the Plan.

COMPLAINT AND DEMAND FOR JURY TRIAL

12.     The Court has personal jurisdiction over Comerica because accounts used to carry out the fraud were opened or experienced account activity originating in the Los Angeles area, principally at Comerica's Studio City branch.

13.     Venue is proper in this District under 28 U.S.C. § 1391 because Comerica is subject to personal jurisdiction in this District for the claims alleged and a substantial part of the events and omissions giving rise to these claims occurred in this District.

## IV.   GENERAL ALLEGATIONS

### A.   The Woodbridge Investment Scheme

14.     Beginning in July 2012 through at least December 4, 2017, Shapiro orchestrated a Ponzi scheme using the Woodbridge Entities.  Shapiro raised about $1.22 billion from more than 8,400 investors nationwide by borrowing funds in connection with promissory notes that investors purchased, and through private placement subscription arrangements under which investors purchased units in Woodbridge funds.  The promissory notes, referred to in this complaint as "FPCMs" or "FPCM notes" — short for First Position Commercial Mortgages — typically had a term of 12 to 18 months and were marketed as paying a 5% to 8% annual return on a monthly basis.  Woodbridge's subscription offerings — the "Fund Offerings" — typically had a five-year term and were marketed as paying a 6% to 10% annual return on a monthly basis and, at the end of five years, a 2% accrued dividend and share of the profits.  Neither type of investment was ever registered with the SEC or any other government agency.

COMPLAINT AND DEMAND FOR JURY TRIAL

15.     The purported revenue source enabling the Woodbridge Entities to pay returns to investors was the interest a Woodbridge affiliate was to receive on loans to third-party owners of commercial real estate.  The Woodbridge Entities represented to investors that this affiliate would pool money from many investors and lend it to a third-party borrower for a short term, and for only about two-thirds of the value of the real estate securing the transaction.  In doing so, the Woodbridge Entities ensured that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing."  According to a Woodbridge FAQ document, "[y]our loan is secured by a hard asset collateral — the property itself."

16.     The Woodbridge Entities further represented to investors that they conducted all due diligence, including title search and appraisal, on the commercial property and borrower.  The Woodbridge Entities also told investors that after one year, the third-party borrower would be obligated to repay the Woodbridge Entities the principal amount of the loan and that upon default Woodbridge could foreclose on the property to recover the full amount owed.

17.     The Woodbridge Entities told investors that the third-party borrowers were paying it 11% to 15% in annual interest for "hard money" loans and that the borrowers were bona fide commercial property owners who could not obtain traditional loans and were willing to pay higher interest rates for short-term financing.  The Woodbridge Entities told FPCM investors that their returns would be derived from those interest

COMPLAINT AND DEMAND FOR JURY TRIAL

payments, falsely promising the investors a pro rata, first-position "lien" interest in the underlying properties and that they would have priority over any other liens or claims on a property if the property owner defaulted. In the offering memoranda for the Fund Offerings, the Woodbridge Entities said investor funds would be used for real estate acquisitions and investments. In reality, the Woodbridge Entities directly applied the incoming funds to pay other investors' returns.

18.  The Woodbridge Entities' marketing materials also falsely stated that the Woodbridge Entities "receive[ ] the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your first position documents." In fact, nearly all of the purported third-party borrowers were hundreds of LLCs that Shapiro owned and controlled and that never made any loan payments to the Woodbridge Entities.

19.  Shapiro supported the Woodbridge Entities' business almost entirely by raising new investor funds and using them to pay returns to existing investors. Of the $1.22 billion they raised from FPCM and Fund Offering investors, the Woodbridge Entities issued only around $675 million in "loans" for real estate that was purportedly securing the investments. And instead of generating the promised 11% to 15% interest, the loans generated only $13.7 million from third-party borrowers — far less than required to operate the Woodbridge Entities' business and pay returns. Notwithstanding this shortfall, the Woodbridge Entities paid investors more than $368 million in interest,

COMPLAINT AND DEMAND FOR JURY TRIAL

dividends and principal repayments.  The Woodbridge Entities spent another $172 million on operating expenses, including $64.5 million for sales commissions and $44 million for payroll, and more than $21 million to finance Shapiro's lavish lifestyle.

### B.    Comerica Accounts

20.    Shapiro's banking activities at Comerica were integral to his scheme.  It was through Comerica account transactions that Shapiro commingled investor funds, applied new investor funds to pay existing investor returns, disbursed investor funds to his wife and her company, and spent millions in investor funds for his own personal enjoyment.

21.    Shapiro could not have carried out his scheme without depositing and transferring a tremendous amount of investor funds among Comerica bank accounts to conceal that the Woodbridge Entities were raising more money than the underlying properties and pledged collateral could support.  Shapiro's use of Comerica accounts to shuffle money through a web of affiliated entities enabled him to use new money to pay older investors, in classic Ponzi fashion, instead of funding payments with interest earned from bona fide third-party mortgages.

22.    Shapiro could not have carried out his scheme without either using a complex array of accounts at different banks so that no single bank would be able to detect the ongoing fraud, or having a single bank — here, Comerica —turn a blind eye to his unorthodox asset transfers, sales of unregistered securities (through unlicensed brokers), commingling of investor funds, and other, highly irregular banking activities.

COMPLAINT AND DEMAND FOR JURY TRIAL

23.     Despite the red flags and atypical banking activity, Comerica sat back and collected fees while it continued to provide Shapiro with the banking support and account platforms needed to carry out his scheme.  Comerica took those fees without good faith or for reasonably equivalent value given.

24.     Comerica understood the Woodbridge Entities' claimed business model: to raise money from investors and use it to make real-estate loans to borrowers.   The Woodbridge Entities would gain income based on the difference between the monthly interest rate they were charging their borrowers and the rate at which they were paying investor returns.  The monthly interest payments the Woodbridge Entities received from the borrowers would supply the funds used to pay the investors.

25.     Comerica, therefore, should have expected to see banking activity consistent with this business model.  That is, the Woodbridge Entities' banking activity should have reflected receipt of investor funds, use of those funds to make loans to borrowers, receipt of interest payments from borrowers, and use of those funds to pay returns to investors. Instead, Comerica observed a great deal of investor money entering the Woodbridge Entities' accounts and an array of other banking activities at odds with the Woodbridge Entities' claimed business model.

26.     Comerica knew that the Woodbridge Entities deposited checks from investors into their accounts at the bank.  The nature of the deposits made it clear that the money came from investors.  The checks were payable to a "Woodbridge Mortgage

COMPLAINT AND DEMAND FOR JURY TRIAL

Investment Fund" account, often with the real estate purportedly securing the investment noted on the face of the check (e.g., the address of the commercial property that supposedly secured the investment). The check amounts were round numbers, generally ranging from $25,000 to $300,000, drawn on accounts of many different individuals and entities across the country.

27.     Instead of using the money deposited from these incoming checks to extend loans to borrowers out of the "Woodbridge Mortgage Investment Fund" account, the Woodbridge Entities transferred the investor funds into their operating account at Comerica. From there, the Woodbridge Entities paid salaries, commissions and bonuses to employees and sales agents and made large, unexplained transfers to attorney trust accounts.

28.     As a further example of banking activity that conflicted with the Woodbridge Entities' business model, the Woodbridge Entities' bank accounts took in only minimal cash from actual borrowers while one should expect to see a regular flow of mortgage interest payments from borrowers reflected in, the accounts. Comerica processed the incoming interest payments, so it accordingly knew that only a limited number of borrowers were making interest payments to the Woodbridge Entities — none of the Shapiro-affiliated entities that received loans was paying any interest. Moreover, Comerica was processing incoming interest payments to the Woodbridge Entities that it knew did not come close to matching the Woodbridge Entities' committed outlays and

purported business operations.

29.     Although the Woodbridge Entities raised at least $1.22 billion from investors, most of which was allegedly secured by third-party mortgage loans, it issued only $675 million in such loans.  And, instead of generating the substantial interest promised to investors, the loans generated only around $13.7 million from bona fide third-party borrowers — much less than required to operate Woodbridge Entities' business and pay returns to the investors.

30.     The Woodbridge Entities did not generate sufficient income and continuously ran at a cash-flow deficit, which ballooned to $250 million by September 2017.  Comerica was aware of the Woodbridge Entities' long-term lack of profitability and, as depositary for all of the Woodbridge Entities' revenues, Comerica saw that the Woodbridge Entities' real-estate business had no meaningful source of incoming cash apart from investor funds.

31.     Gaps in the company's funding were covered by large, one-time bridge loans from wealthy individuals Shapiro personally solicited.  Shapiro deposited these cash infusions, keeping the Woodbridge Entities afloat in newly opened accounts at Comerica bearing the phrase "Woodbridge Commercial Bridge Loan Fund."

32.     Shapiro pooled investor funds in fund entity accounts, then commingled them into a single Woodbridge operating account under his control.  His commingling of assets involved around $1.66 billion in transfers and nearly 11,000 Comerica account

1   transactions.   The illegitimacy of Woodbridge's real-estate investment business was

2   apparent to Comerica through the unusual nature and high volume of this account activity

3   and should have caused Comerica to take responsive measures.

4        33.    Shapiro applied $368 million in new investor funds to pay existing investors

5   out of Comerica accounts.  Shapiro also applied investor funds in Comerica accounts to

6   purchase almost 200 properties in the Los Angeles and Aspen areas for around $675

7   million.   The net returns from those properties were nominal, with many remaining

8   undeveloped, vacant lots.  Comerica ignored the Woodbridge Entities' financial numbers

9   and the fact that its intake of investor funds was not matched by corresponding real-estate

10  development or lending to genuine counterparties.

11       34.    Shapiro disbursed investor monies out of the Woodbridge Entities' Comerica

12  accounts for suspicious expenditures such as $1.4 million in luxury, retail purchases at

13  stores like Chanel and Louis Vuitton, $1.6 million in home furnishings, $1.2 million in

14  alimony to his ex-wife, $340,000 for luxury cars, and $400,000 in jewelry.  Shapiro also

15  diverted investor funds to pay off approximately $9 million in credit card debt.  Shapiro's

16  self-dealing extended to his family as well. His wife and her company Schwartz Media

17  received substantial investor proceeds from the Woodbridge Entities' Comerica accounts.

18       35.    Despite these signs of an illicit enterprise and the mounting regulatory orders

19  against the Woodbridge Entities, Comerica failed to report the fraudulent conduct or

20  otherwise act upon the red flags connected with the Woodbridge Entities' accounts.

COMPLAINT AND DEMAND FOR JURY TRIAL

Instead, it continued to accept deposits of the Woodbridge Entities' investor money and carry out the transfers needed to consummate the fraud.

36.     Comerica also collected substantial fees from the accounts and transactions, without giving reasonably equivalent value.

**C.     SEC Enforcement and Investor Class Action**

37.     On December 1, 2017, still owing more than $961 million in principal to investors, the Woodbridge Entities missed their first interest payments to investors.  On December 4, 2017, Shapiro caused most of his companies to declare Chapter 11 bankruptcy.

38.     On December 20, 2017, the SEC filed a civil complaint for injunctive and other relief, charging that Shapiro ran a "massive Ponzi scheme."

39.     The court acted immediately on the SEC's emergency ex parte motion for a temporary asset freeze and a sworn accounting of all Woodbridge accounts, granting the motion on December 20, 2017 and "find[ing] good cause to believe that unless immediately restrained and enjoined . . . Defendants Shapiro, RS Trust, Non-Filer Shapiro Property LLCs and Non-Filer Shapiro Holding LLCs, will continue to dissipate, conceal or transfer . . . assets that are likely subject to an Order of disgorgement."

40.     On January 4, 2018, investors in the fraudulent scheme filed a class action against Comerica for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, negligence, and violations of the Unfair Competition Law, *Jay Beynon Family Trust*

13

COMPLAINT AND DEMAND FOR JURY TRIAL

1    *DTD 10/23/1998 v. Comerica Bank*, No. 2:18-cv-00103-DMG-KS (C.D. Cal.) (the "Class

2    Action").  The Trustee is pursing Contributed Claims as part of the Class Action.

3        41.    In the Class Action, investors allege that Comerica had notice of Shapiro's

4    fraud from a series of red flags and atypical banking activities associated with the accounts

5    from which Shapiro misappropriated over $21 million in investor funds.

6        42.    The investors allege that Shapiro's banking activities at Comerica were

7    integral to his scheme to defraud investors and that Comerica substantially assisted, and

8    had knowledge of, the Woodbridge Entities' investor fraud.

9    **D.    Woodbridge Litigation Trust**

10       43.    On October 26, 2018, the U.S. Bankruptcy Court for the District of Delaware

11   entered an order confirming the Plan.

12       44.    Under the terms of the Plan, the Trust was formed to pursue, hold and

13   administer the liquidation of trust assets and to make distributions to the Trust

14   beneficiaries.  The assets of the Trust include all the Estate Claims — which include

15   avoidance actions and all causes of action held by the Debtors (including the Woodbridge

16   Entities) and their estates — and the Contributed Claims.

17       45.    "Avoidance actions" include "[a]ny and all causes of action, claims,

18   remedies, or rights that may be brought by or on behalf of the Debtors or the Estates under

19   Bankruptcy Code sections 542, 544, 547, 548, 549, 550, 551, or *553,* or under related state

20   or federal statutes, or pursuant to any theory or cause of action under common law."  Plan

14

at ¶ 1.5.

46.     The Contributed Claims include:

(a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of any Notes or Units; (b) all Causes of Action for unlawful dividend, fraudulent conveyance, fraudulent transfer, voidable transaction, or other avoidance claims under state or federal law; (c) all Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (d) all Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of, any of the conduct described in the Disclosure Statement, including in respect of any alleged fraud related thereto.

Plan at ¶ 1.28.

47.     Because Shapiro, the Woodbridge Entities, and others acting in concert with them concealed their Ponzi scheme, suspicion and discovery of the claims in this lawsuit was delayed, as were the facts underlying them.

48.     On April 4, 2019, Shapiro and two associates were indicted by the U.S. government for, among other alleged crimes, mail and wire fraud. *U.S. v. Shapiro*, No. 19-20178-CR-ALTONAGA/GOODMAN (S.D. Fla.). The United States alleges, among other allegations, that "Shapiro controlled Woodbridge's bank accounts and was the sole signatory on all of Woodbridge and its affiliates' bank accounts, hand-signing thousands

COMPLAINT AND DEMAND FOR JURY TRIAL

1    of checks to sales agents and others" totaling more than $80 million.  The government also

2    alleges that Shapiro and his co-conspirators instructed investors to make payments for the

3    Woodbridge investments via interstate wires to those bank accounts.

4    49.    All conditions precedent to this action have occurred or have been waived.

5    **COUNT I – AVOIDANCE AND RECOVERY OF**
     **ACTUAL FRAUDULENT TRANSFERS**

6    **(Pursuant to Cal. Civ. Code § 3439.04(a)(1))**

7    50.    The Trustee realleges and reincorporates paragraphs 1 through 49 above as

8    if fully set forth herein.

9    51.    This is a claim to avoid and recover fraudulent transfers pursuant to Cal. Civ.

10   Code § 3439.04(a)(1).

11   52.    At all relevant times, Comerica provided banking services to the Woodbridge

12   Entities through various bank accounts.  Those bank accounts were used to carry out the

13   Ponzi scheme.

14   53.    The Woodbridge Entities paid substantial fees and other monies to Comerica

15   relating to the Woodbridge Entities' accounts, including, *inter alia*, transfer fees, service

16   fees, transaction fees, and online banking fees.  Comerica had dominion and control over

17   these fees.

18   54.    At the time of the transfers, the Woodbridge Entities were operating as a

19   classic Ponzi scheme.  Comerica provided banking services in support of the scheme.

20   Comerica received the fees from the Woodbridge Entities in connection with and in

16

COMPLAINT AND DEMAND FOR JURY TRIAL

furtherance of that scheme.  Despite the red flags and atypical banking activity, Comerica sat back and collected the fees while continuing to provide Shapiro and the Woodbridge Entities with the banking support and account platforms needed to carry out the scheme. The Woodbridge Entities did not receive reasonably equivalent value in exchange for the transfers.

55.     Accordingly, the transfers to Comerica are avoidable pursuant to Cal. Civ. Code § 3439.04(a)(1).

WHEREFORE, the Trustee requests judgment in his favor (i) avoiding and recovering the fraudulent transfers pursuant to Cal. Civ. Code § 3439.04(a)(1); (ii) awarding pre-judgment and post-judgment interest and costs; and (iii) granting such other and further relief as the Court deems just and proper.

### COUNT II – AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS
**(Pursuant to Cal. Civ. Code § 3439.04(a)(2))**

56.     The Trustee realleges and reincorporates paragraphs 1 through 49 above as if fully set forth herein.

57.     This is a claim to avoid and recover fraudulent transfers pursuant to Cal. Civ. Code § 3439.04(a)(2).

58.     At all relevant times, Comerica provided banking services to the Woodbridge Entities through various bank accounts.  Those bank accounts were used to carry out the Ponzi scheme.

COMPLAINT AND DEMAND FOR JURY TRIAL

59.     The Woodbridge Entities paid substantial fees and other monies to Comerica relating to the Woodbridge Entities' accounts, including, *inter alia*, transfer fees, service fees, transaction fees, and online banking fees.  Comerica had dominion and control over these fees.

60.     At the time of the transfers, the Woodbridge Entities were operating as a classic Ponzi scheme.  Comerica provided banking services in support of the scheme.  Comerica received the fees from the Woodbridge Entities in connection with and in furtherance of that scheme.  Despite the red flags and atypical banking activity, Comerica sat back and collected the fees while continuing to provide Shapiro and the Woodbridge Entities with the banking support and account platforms needed to carry out the scheme.  The Woodbridge Entities did not receive reasonably equivalent value in exchange for the transfers.

61.     At all times, including the time of the fee transfers, the Woodbridge Entities were engaged, or were about to engage, in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.  Furthermore, the Woodbridge Entities intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

62.     Because the Woodbridge Entities were operating as a Ponzi scheme, they were *de facto* insolvent.

63.     Accordingly, the transfers to Comerica are avoidable pursuant to Cal. Civ.

18

COMPLAINT AND DEMAND FOR JURY TRIAL

Code § 3439.04(a)(2).

WHEREFORE, the Trustee requests judgment in his favor (i) avoiding and recovering the fraudulent transfers pursuant to Cal. Civ. Code § 3439.04(a)(2); (ii) awarding pre-judgment and post-judgment interest and costs; and (iii) granting such other and further relief as the Court deems just and proper.

**COUNT III – AVOIDANCE AND RECOVERY OF
CONSTRUCTIVE FRAUDULENT TRANSFERS
(Pursuant to Cal. Civ. Code § 3439.05)**

64. The Trustee realleges and reincorporates paragraphs 1 through 49 above as if fully set forth herein.

65. This is a claim to avoid and recover fraudulent transfers pursuant to Cal. Civ. Code § 3439.05.

66. At all relevant times, Comerica provided banking services to the Woodbridge Entities through various bank accounts. Those bank accounts were used to carry out the Ponzi scheme.

67. The Woodbridge Entities paid substantial fees and other monies to Comerica relating to the Woodbridge Entities' accounts, including, *inter alia*, transfer fees, service fees, transaction fees, and online banking fees. Comerica had dominion and control over these fees.

68. At the time of the transfers, the Woodbridge Entities were operating as a classic Ponzi scheme. Comerica provided banking services in support of the scheme.

COMPLAINT AND DEMAND FOR JURY TRIAL

Comerica received the fees from the Woodbridge Entities in connection with and in furtherance of that scheme. Despite the red flags and atypical banking activity, Comerica sat back and collected the fees while continuing to provide Shapiro and the Woodbridge Entities with the banking support and account platforms needed to carry out the scheme. The Woodbridge Entities did not receive reasonably equivalent value in exchange for the transfers.

69.     The Woodbridge Entities were insolvent at the time of the transfers or became insolvent as a result of the transfers.

70.     Accordingly, the transfers to Comerica are avoidable pursuant to Cal. Civ. Code § 3439.05.

WHEREFORE, the Trustee requests judgment in his favor (i) avoiding and recovering the fraudulent transfers pursuant to Cal. Civ. Code § 3439.05; (ii) awarding pre-judgment and post-judgment interest and costs; and (iii) granting such other and further relief as the Court deems just and proper.

## **COUNT IV – UNJUST ENRICHMENT**

71.     The Trustee realleges and reincorporates paragraphs 1 through 49 above as if fully set forth herein.

72.     The Woodbridge Entities conferred benefits on Comerica in the form of substantial fees and other monies to Comerica relating to the Woodbridge Entities' accounts, including, *inter alia*, transfer fees, service fees, transaction fees, and online

COMPLAINT AND DEMAND FOR JURY TRIAL

banking fees.

73.    At the time of the transfers, the Woodbridge Entities were operating as a classic Ponzi scheme.  Comerica provided banking services in support of the scheme. Comerica knowingly received the fees from the Woodbridge Entities in connection with and in furtherance of that scheme.  Despite the red flags and atypical banking activity, Comerica sat back and collected the fees while continuing to provide Shapiro and the Woodbridge Entities with the banking support and account platforms needed to carry out the scheme.

74.    The Woodbridge Entities did not receive a benefit in exchange for the transfers.

75.    Comercia has unjustly retained those transfers at the expense of the Woodbridge Entities.

WHEREFORE, the Trustee requests judgment in his favor (i) awarding damages, pre-judgment and post-judgment interest and costs; and (ii) granting such other and further relief as the Court deems just and proper.

## COUNT V – INCORPORATED CLAIMS

76.    The Trustee realleges and reincorporates paragraphs 1 through 49 above as if fully set forth herein.

77.    In the Class Action, investors have sued Comerica for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, negligence, and violations of the

COMPLAINT AND DEMAND FOR JURY TRIAL

1  Unfair Competition Law;

2     78.    In the event the claims being pursued in the Class Action, including

3  Contributed Claims, are ultimately determined to be Estate Claims, those claims are

4  hereby incorporated into this Complaint.

5     WHEREFORE, pursuant to Fed. R. Civ. P. 8(d), if the Court in the Class Action

6  concludes that any or all of the Class Action claims are properly Estate Claims, the Trustee

7  requests that the Court (i) enter judgment in his favor against Comerica for each of those

8  claims, and (ii) grant such other and further relief as the Court deems just and proper.

9                              **DEMAND FOR JURY TRIAL**

10    Plaintiff hereby demands a jury trial for all issues so triable.

11

12  Dated: April 26, 2019                    Respectfully submitted,

13                                    By:    /s/ *Graham B. LippSmith*
                                            Kenneth S. Kasdan, SBN 71427
14                                          kkasdan@kasdancdlaw.com
                                            Graham B. LippSmith, SBN 221984
15                                          glippsmith@klwtlaw.com
                                            Jaclyn L. Anderson, SBN 258609
16                                          janderson@klwtlaw.com
                                            **KASDAN LIPPSMITH WEBER**
17                                          **TURNER LLP**
                                            360 East 2nd Street, Suite 300
18                                          Los Angeles, CA  90012
                                            Telephone: 213-254-4800
19                                          Facsimile: 213-254-4801

20                                    -and-

22

COMPLAINT AND DEMAND FOR JURY TRIAL

JEFFREY C. SCHNEIDER, P.A.,
*(pro hac vice pending)*
Primary: jcs@lklsg.com
Secondary: lv@lklsg.com
JASON K. KELLOGG P.A.
*(pro hac vice pending)*
Primary: jk@lklsg.com
Secondary: mco@lklsg.com
**LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP**
CitiGroup Center, 22nd Floor
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 403.8788
Facsimile: (305) 403.8789

Attorneys for Plaintiff

COMPLAINT AND DEMAND FOR JURY TRIAL